# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00194-CR

**The State of Texas, Appellant**

**v.**

**Reynaldo Lerma, Appellee**

**FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
NO. CR-15-0598, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

After the State of Texas failed to disclose the identity of a confidential informant, the trial court granted appellee Reynaldo Lerma's motion to dismiss the capital murder charges against him pursuant to Texas Rule of Evidence 508. *See* Tex. R. Evid. 508(c)(2)(A)(i); *see also* Tex. Penal Code § 19.03 (describing offense of capital murder). The State appeals from that order. Because we conclude that Lerma failed to meet his burden of showing that a reasonable probability exists that the informer could give testimony necessary to a fair determination of his guilt or innocence, we will reverse the trial court's order and remand this cause to the trial court for further proceedings.

## BACKGROUND

Lerma was indicted for capital murder in connection with the death of Joel Espino. The State's theory of the case, as it emerges from the record before us, is that Espino and his roommate Andrew Alejandro were narcotics dealers. Lerma and several co-defendants allegedly

approached the residence where Espino and Alejandro lived and attempted to rob them. During the attempted robbery, Alejandro shot and killed Espino and also shot and wounded two of Lerma's co-defendants. Alejandro was the only person who discharged a firearm during the encounter. The State charged Lerma and several co-defendants with capital murder and one co-defendant with robbery. The record indicates that the State has not charged Alejandro in connection with this event.

Before trial, the Defense learned that a confidential informant (CI) working with the Hays County Narcotics Task Force (the Task Force) made a controlled buy of marihuana from Espino about three months prior to the shooting. The Defense further learned that Espino was not charged after the buy and that the purchased drugs were ordered destroyed. At a pretrial hearing in August 2016, the Defense informed the trial court, "We believe [Espino] was acting as a CI and we would like to have any information that pertains to that." The following exchange then occurred:

> Prosecutor: I don't think we can be required to conduct—or to provide them with discovery that is basically just a fishing expedition to see whether or not there might be something there.
>
> Defense: Judge, if he was snitching on his roommate and the roommate shot him in the head, I think that is relevant.
>
> The Court: I do, too.
>
> ***
>
> The Court: I will just put a gag order on the defense, but he's going to have to get to see anything that's been generated, any debriefing, anything like that the defense team gets to look at it because they—they would know what might be exculpatory. I would not.

2

At another pretrial hearing in May 2017, the Defense proposed that Alejandro may have intentionally shot and killed his roommate, Espino, because he had found out that Espino was working as a CI. The following exchange occurred:

> The Court: Sounds like it could be exculpatory. What says the state?
>
> Prosecutor: It's pure speculation, Your Honor.
>
> The Court: It is. But you have to look at it or I have to look at it to make sure that it is speculation.

The prosecutor then informed the court that "Espino was never developed as a confidential informant" and that there was "no further investigation of Espino." The prosecutor argued that "what [defense] counsel is speculating is that they [the Task Force] are lying to me." After further discussion, the following exchange occurred:

> The Court: Affidavits, or something of that nature, may do, but after what happened in Williamson County a couple years back, I am not going to be anywhere near anything close to that. I don't give a damn about a confidential informant. Sorry.
>
> Prosecutor: The law—the law—
>
> The Court: The truth shall set you free and I'm going to order it all be—
>
> Prosecutor: The law makes that privilege[d], Your Honor.
>
> The Court: Well, it may be privileged, but I don't—privileged be damn[ed] if it means that the defense lawyer can't get exculpatory evidence in a capital murder case.

Near the conclusion of the hearing, the trial court told the Defense, "Prepare whatever order you need. You are going to get to look at it."

At a hearing in June 2017, the trial court clarified that it was finding that the CI could give testimony necessary to a fair determination of guilt or innocence. The prosecutor stated, "Note our exception, please, Your Honor." The trial court responded, "Except all you want, Counselor. You know where the appellate court is."

The trial court signed an order requiring the State to allow the Defense to view the entire case file, including the CI file. The State filed a petition for writ of mandamus in this Court, arguing that the trial court was violating Rule 508 by ordering the State to produce this information without providing the State an in camera hearing. *See* Tex. R. Evid. 508(c)(2)(C)(i) ("If it appears that an informer may be able to give the testimony required to invoke this exception and the public entity claims the privilege, the court must give the public entity an opportunity to show in camera facts relevant to determining whether this exception is met."). This Court denied the petition. The State then filed a petition for writ of mandamus in the Texas Court of Criminal Appeals. However, the parties and the trial court reached an agreement that the State would withdraw its mandamus petition and the trial court would hold an in camera hearing as the State requested.

The State withdrew its petition, and the trial court held the in camera hearing in July 2017. At the hearing, the prosecutor explained that he was originally under the impression that the Task Force would be able to identify the CI but that he had subsequently learned that the Task Force did not know the CI's identity because they had failed to document it. The following exchange then occurred:

> The Court: You believe this man? You believe this is true? You believe they are telling you the truth or are they bullshitting you?

4

Prosecutor: I believe they are telling me the truth.

The Court: Load of shit, for the record, that's what it sounds like.

Prosecutor: I told them the judge is going to want to talk to you about this. You are going to have to understand this sounds like—

The Court: Sounds horrible.

The trial court later commented, "So difficult to believe, Wesley.[1] I am sorry. Sounds like a total crock." The court eventually agreed to hear testimony from members of the Task Force, stating the following:

> I will listen to your officer's fairy tale. I am going to tell you right now, I am going to stay with my ruling and whatever you got needs to be shown to the Erwins,[2] meaning their lawyers, not the client, and if you determine that it is exculpatory, you show me what you got and we will discuss it at that point. But you need to know everything that these officers do know. It sounds like it is not much.

Before the testimony began, the following exchange occurred concerning the Task Force's credibility:

> The Court: Their credibility is a little bit suspect here. I am going to make that ruling. I am going to say that right on the record.
>
> Prosecutor: I understand that if the—if the theory is going to be we can put whatever words in narcotics' mouth and use that to justify whatever ruling we are going to ask the court to make, because whatever denials they make, we are not going to believe—
>
> The Court: Going to get called and grilled in front of the fact finder.

---

[1] That is, Wesley H. Mau, the Hays County Criminal District Attorney, who represented the State.

[2] Lerma was represented by the Erwin Law Firm, LLP.

Prosecutor: Any speculation that the defense counsel wants to engage in, they can support that by simply saying that that's been denied from any witness that—who might know about it because we don't trust the witness. That's not the standard. You can't offer evidence.

\*\*\*

The Court: This is a capital murder case where they did a control[led] buy and it is all missing. And they didn't follow the rules and now they are telling us they don't know who the informant is.

Prosecutor: Right.

The Court: I have got to tell you that my bullshit meter is pegging out right about now.

Before hearing testimony, the trial court also made the following comments:

After the Michael Morton Act, I can't imagine anybody is going to stop them from calling anybody they want to and going down any bunny trail in the world that they want to.

\*\*\*

This stinks to high heaven and the fact finder considering capital murder should know how bad it stinks.

The trial court then heard testimony from Detective Teddy Grabarkewitz, who worked for the Hays County Sheriff's Office and the Task Force. Detective Grabarkewitz testified that he was present during the controlled buy from Espino and that he saw the CI. He further testified that the Task Force was "not sure who the informant was because it was two years ago and we failed to document a CI—confidential informant on the individual." Detective Grabarkewitz testified that he remembered that the CI was male but could not recall his race or ethnicity. He also admitted to the court that the Task Force failed to document the CI as required by Task Force rules and that he

6

was reprimanded by receiving "a verbal counsel by Sergeant Wade Parham." In addition, Detective Grabarkewitz testified that no charges were filed against Espino after the controlled buy. He further stated that he had a copy of a motion to destroy the marihuana used in the buy. He explained, "We will put in automatically to destroy the evidence on qualifying informant buys. We don't keep those."

After learning that Detective Grabarkewitz did not "know anything about the facts of this capital murder," the trial court presented "a thumbnail view" of the case and of the Defense's concerns regarding the CI. The trial court explained the theory that Espino's roommate "got information about your controlled buy and feared that Espino was going to turn on him" and "used this fracas [the attempted robbery] as an opportunity to get rid of him so that it would never happen." The following exchange occurred:

> The Court: Do you think there is any—I mean, you are a narcotics officer here for many years. Do you think that is very plausible?
>
> Detective Grabarkewitz: Well, we never used Espino as an informant. Somebody bought from Espino.
>
> The Court: See, he wouldn't know that. All he'd need to know is that he made a controlled buy from the narcs.
>
> Detective Grabarkewitz: Is it possible that somebody found out that we did a controlled buy?
>
> The Court: Unless the informant, if he knew Joel [Espino], chances are pretty good he could have known the two roommates and he might have told him.
>
> Detective Grabarkewitz: Anything is possible, sir.
>
> ***

7

Detective Grabarkewitz: So—yes, sir. And so anything is possible. I mean, I don't know for sure one way or the other, but anything is possible, sir. Anything is possible.

\*\*\*

The Court: Well, anything else you think would—what—my duty is to make sure if there is any evidence out there . . . any of you that could indicate that Mr. Lerma is not the guilty party here, he may have been a dupe. Do you know anything that would—anything that might be evidence of that?

Detective Grabarkewitz: No, sir, I don't.

The trial court next heard testimony from Sergeant Wade Parham, who commanded the Task Force. Sergeant Parham admitted that the Task Force did not follow their rules requiring the documenting of the CI and that a detective received a verbal reprimand because of this failure. Sergeant Parham also testified that the Task Force told the District Attorney that they did not know the CI's identity "[s]hortly after we received subpoena on the hearing, I believe I—I am wanting to say the hearing earlier this year" and that this occurred "[m]any months ago."

The trial court then questioned Sergeant Parham about an affidavit entered into evidence in which Sergeant Parham stated, "As an appropriate representative of the [Task Force] and the San Marcos Police Department, the public entity to which the informer furnished the information, I claim the privilege afforded by Texas Rules of Evidence, Rule 508, to refuse to disclose the person's identity."[3] The court asked him how he could "assert a privilege if you don't

---

[3] In the affidavit, which bears a different cause number and was apparently filed in a case involving one of Lerma's co-defendants, Sergeant Parham also averred the following:

The operation was for intelligence gathering purposes only and Espino was never arrested or charged with the offense. Espino was never interviewed, debriefed or developed as a confidential informant by [the Task Force]. In accordance with

8

know who the informant is." Sergeant Parham responded, "At this time, Your Honor, I don't recall if I was aware that we didn't actually have an informant file on this person at that time."

The following exchange then occurred when the trial court questioned Sergeant Parham about the theory that Alejandro may have intentionally killed Espino:

> The Court: Well, the defense team in this case are concerned that somebody may have informed the roommate who shot Mr. Espino . . . twice, once in the head and once in the hip. Did—and did shoot two other people too, but not fatally. Somebody may have told him about this controlled buy and he may have been very suspicious and paranoid about his roommate and may have used this particular affray as an opportunity to dispose of the problem. Do you see how that would be exculpatory?
>
> Sergeant Parham: Yes, Your Honor.
>
> The Court: And we can't tell because we don't know who the informant is. But Detective Grabarkewitz indicated that the informant knew Espino, named him, and went to the trailer on his own information he had. And since Espino was roommates with the shooter and one other person, he could well have known them too and could have at some point told him about this controlled buy and that could have been the motive for this roommate to shoot Mr. Espino.
>
> Sergeant Parham: Yes.
>
> The Court: That's very troubling. And you can understand that your officer's failure to follow the rules has negated the possibility of finding exculpatory evidence and it may require dismissal of the case. I don't know. We are going to look at the case law on it and see what has to happen. This is very serious.

Sergeant Parham then testified, "Well, we have scoured all records that we have . . . . We have gone back looking at—through our records months previously to attempt to find it. And

---

departmental policy regarding the disposition and retention of non-evidentiary property or contraband, the marijuana purchased from Espino in March 2015 was destroyed. In the months to follow, no [Task Force] officers conducted any further investigation of Espino or surveillance of his residence . . . .

that, and phone records of the detectives, we have come up with nothing, Your Honor." He also testified that he was "certain" that "the confidential informant that was used was not one of the defendants in the capital murder." Sergeant Parham further testified, "And Joel Espino, after that one informant did the controlled buy from him, that informant broke contact with us. Never called us back. Never returned phone calls. And we performed no further investigation on Espino." The court then stated, "That doesn't mean that his roommate might not have feared that . . . justifiably." Sergeant Parham responded, "That's right."

The final witness from which the trial court heard testimony was Officer Lenny Martinez. Officer Martinez testified that Espino was shot in the head and the hip by his roommate. Officer Martinez further testified that he was present during the controlled buy from Espino but that he did not know the CI's identity. He testified that the CI was a "white male," "fairly thin," and was "a little taller" than Officer Martinez, who was "five-eight." Officer Martinez also admitted that the Task Force had failed to follow its rules concerning documenting the CI. When asked when he first told the District Attorney that he did not know the identity of the CI, Officer Martinez answered, "Here recently when the subpoena came out to appear at this hearing." After again explaining the theory that Alejandro killed Espino after learning of the controlled buy, the court asked, "So, see, I mean, that could be evidence of innocence at least to the murder?" Officer Martinez responded, "Yes, sir." The following exchange then occurred:

> The Court: Do you know of any evidence about any of that through your work as a narcotics officer that might substantiate or might be evidence of that?
>
> Officer Martinez: No, sir, I don't. I know Mr. Espino wasn't charged with any drug-related offenses during my—

10

The Court: Which is unusual, isn't it? Why would you make a controlled buy from somebody and never follow up on it?

Officer Martinez: And that's what I think was maybe going to happen, was that there was going to be some additional follow-up investigation taking place involving Mr. Espino, but I wasn't in narcotics very much longer. I was in narcotics approximately ten months before I ended up leaving the division and returning to the major crimes division with the—

***

Officer Martinez: And as far as I know, Mr. Espino wasn't considered or even wasn't under any contract saying that Mr. Espino was a criminal informant for the task force.

After hearing testimony, the trial court stated, "The actual shooter who may have had a motive. And we can't . . . we can't investigate that because the task force didn't follow the rules . . . . I think that is all exculpatory." The court later declared, "Well, I do find there is—a reasonable probability exists that the informant could give testimony if we knew who he was."

In November 2017, the Defense filed a motion to dismiss pursuant to Rule 508, and the trial court held a hearing on the motion on December 4. At the hearing, the trial court reiterated its finding: "It's very—what I—my actual finding is and my belief is that it's very possible that if they had disclosed the name of this informant, he or she might have been able to—might have had access to exculpatory evidence that you would be entitled to. And you're being denied it by either their incompetence or their . . . for whatever reason." On December 14, the State provided an email to the Defense. The email was dated August 19, 2016, and was addressed from "Sergeant Wade Parham" to "Wes Mau." In the email, Sergeant Parham states, "My report on the homicide, filed two weeks after the shooting, clearly stated that Espino was once a suspect and target of an investigation. The investigation was suspended and Espino was never arrested or charged with a

11

drug offense. Espino was never an informant." The email continued, "And just in case he asks, I'm not going to reveal which informant made the purchase from Espino . . . . It wasn't anyone involved in the homicide." On the following day, December 15, the Defense filed an amended motion to dismiss pursuant to Rule 508.

In March 2018, the trial court signed an order granting Lerma's motion to dismiss pursuant to Rule 508. The court subsequently issued findings of fact and conclusions of law, which included, among other things, the following:

- Joel Espino, the deceased, was shot multiple times by a single, uncharged actor, Andrew Alejandro. Mr. Espino and Mr. [Alejandro] lived together and sold narcotics from the location where the charged offenses occurred.

- On August 19, 2016, Wade Parham, Commander of the [Task Force] emailed the District Attorney and acknowledged that he knew the identity of the CI, but would not disclose the identity to the defense. This email communication was not provided to the Court and to the Defense until December 14, 2017, after the in camera hearing held by this Court.

- This Court held an in camera hearing on July 27, 2017, and after interviewing two members of the [Task Force] and the Commander of the [Task Force], made the determination under TRE 508 that a reasonable probability exists that the confidential informer could give testimony to a fair determination of guilt or innocence in cause number CR-15-0598.

- Teddy Grabarkewitz testified that it was very possible that the CI knew the deceased's roommates as well, including Andrew Alejandro, the only person who fired shots the evening of the alleged offense, and who shot the deceased multiple times.

- Teddy Grabarkewitz further testified that the CI could have informed Andrew Alejandro, the deceased's roommate, of the controlled buy that occurred between the deceased and the CI.

- Wade Parham testified that he understood how the identity of the CI could potentially be exculpatory in Mr. Lerma's case.

12

- Lenny Martinez testified that the identity of the informant could provide evidence proving that Mr. Lerma was innocent of murder.

- Ultimately, all members of the [Task Force] testified during the in camera hearing that they do not know the identity of the CI; the Court finds this testimony to lack credibility, and to be inconsistent with other testimony and exhibits in the case. After the State claimed the CI privilege and sought extraordinary relief up to The Court of Criminal Appeals to protect the identity of the CI (known only to the state), the State now claims they do not know the identity of the CI. The State's inconsistent position of protecting a privileged CI, and then claiming to not know the identity of the CI casts doubt on the reliability and credibility of the States' witnesses.

- The fact that Commander Parham states in this email correspondence that the CI is not anyone involved in the murder, indicates that he must have reviewed some file or some information before sending the email to the District Attorney, as Mr. Lerma's case is not one of Commander Parham's cases, and not a case that he had familiarity with at the date of the email.

- The Court has taken into consideration when analyzing this email, the fact that the State exhausted every legal remedy possible to prevent the Defense from knowing the identity of the CI, combined with the fact that the testimony of all the [Task Force] Officers lacked credibility. Further, common sense dictates that if it truly were the case that the identity of the informant was unknown, that Commander Parham would have simply disclosed this information August 19, 2016.

This appeal followed.

### APPLICABLE LAW AND STANDARD OF REVIEW

Under Rule 508, the State and its subdivisions have a "privilege to refuse to disclose a person's identity" if "the person has furnished information to a law enforcement officer" and "the information relates to or assists in the investigation." Tex. R. Evid. 508(a); *see Boyd v. State*, No. 04-17-00193-CR, 2018 WL 3129463, at *7 (Tex. App.—San Antonio June 27, 2018, no pet.) (mem. op., not designated for publication); *Davis v. State*, No. 03-13-00456-CR, 2014 WL 5107129,

13

at *4 (Tex. App.—Austin Oct. 8, 2014, no pet.) (mem. op., not designated for publication). "The privilege may be claimed by an appropriate representative of the public entity to which the informer furnished the information." Tex. R. Evid. 508(b). "[T]his privilege does not apply if the court finds a reasonable probability exists that the informer can give testimony necessary to a fair determination of guilt or innocence." *Id.* R. 508(c)(2)(A). "If the court so finds and the public entity elects not to disclose the informer's identity . . . on the defendant's motion, the court must dismiss the charges to which the testimony would relate . . . ." *Id.* R. 508(c)(2)(A)(i). Before dismissing the case, however, "the court must give the public entity an opportunity to show in camera facts relevant to determining whether this exception is met." *Id.* R. 508(c)(2)(C)(i).

"The defendant has the threshold burden of demonstrating that identity must be disclosed." *Bodin v. State*, 807 S.W.2d 313, 318 (Tex. Crim. App. 1991); *see Boyd*, 2018 WL 3129463, at *7 ("In seeking disclosure of an informant's identity under that exception, the defendant bears the threshold burden of establishing a reasonable probability that the informant's testimony would be necessary to a fair determination of guilt or innocence."); *accord Davis*, 2014 WL 5107129, at *4 (citing *Sanchez v. State*, 98 S.W.3d 349, 355 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd)). "Since the defendant may not actually know the nature of the informer's testimony, however, he or she should only be required to make a plausible showing of how the informer's information may be important." *Bodin*, 807 S.W.2d at 318; *see Haggerty v. State*, 429 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("Appellant must make a plausible showing of how the informant's information may be important."). Nevertheless, "mere conjecture or speculation" is not sufficient to satisfy the defendant's burden to show "that the informer's identity must be disclosed." *Bodin*,

14

807 S.W.2d at 318; *see Boyd*, 2018 WL 3129463, at \*7 ("To meet this burden, the defendant must show the informant's testimony would significantly aid his defense; mere conjecture or speculation is insufficient, as is merely filing a motion for disclosure."); *Haggerty*, 429 S.W.3d at 8 ("Before a court orders the identity of the informant to be revealed, the informant's potential testimony must be shown to significantly aid the defendant; mere conjecture about possible relevance is insufficient to meet the threshold burden."). We review the trial court's ruling on Lerma's motion to dismiss for an abuse of discretion. *See Boyd*, 2018 WL 3129463, at \*7; *Davis*, 2014 WL 5107129, at \*5; *State v. Sotelo*, 164 S.W.3d 759, 763 (Tex. App.—Corpus Christi 2005, no pet.); *Sanchez*, 98 S.W.3d at 356.

## DISCUSSION

In its sole appellate issue, the State contends that the trial court abused its discretion in granting Lerma's motion to dismiss pursuant to Rule 508 because: (1) Lerma offered no evidence to establish that a reasonable probability exists that the informer could give testimony necessary to a fair determination of his guilt or innocence; (2) the evidence that the trial court received at the in camera hearing shows only that the CI purchased marihuana from the deceased several months earlier but demonstrates no other link between the controlled buy and the capital murder; and (3) the evidence does not show "an 'election' by police to withhold disclosure" but rather that "the informant's identity [wa]s no longer known at the time of the Rule 508 hearing." Because they are dispositive, we will address the State's first two arguments.

Even if we defer to the trial court's finding that the Task Force officers who testified at the hearing were untruthful, we cannot conclude, based on the record before us, that Lerma met his initial burden of showing that a reasonable probability exists that the informer could give

15

testimony necessary to a fair determination of his guilt or innocence. The record before us indicates that the officers merely affirmed that the hypothetical the trial court proposed, in which Alejandro intentionally killed Espino, was "possible." The officers did not testify that the hypothetical situation was very likely, more likely than not, or even reasonably probable. Nor did they testify that they believed the hypothetical theory to be true or that they had any reason to believe that it was true.

For example, when the trial court asked Detective Grabarkewitz whether it was possible "that somebody found out that we did a controlled buy," the detective responded that "anything is possible." When the court then asked whether he knew "anything that might be evidence of that," Detective Grabarkewitz answered, "No, sir, I don't." Similarly, when the trial court asked Commander Parham whether he saw how the court's hypothetical could be exculpatory, he responded, "Yes, Your Honor." However, he went on to emphasize that the CI was not involved in the alleged capital murder, that the CI had no further contact with the Task Force after the controlled buy from Espino, and that Espino never became an informer for the Task Force. Finally, although Officer Martinez affirmed that the hypothetical situation could be exculpatory, when the court asked him whether he knew "of any evidence about any of that . . . that might substantiate or might be evidence of that," Officer Martinez answered, "No, sir, I don't." Therefore, no witness testified that he was aware of any evidence to support the theory that Alejandro intentionally killed Espino, and two of the witnesses explicitly denied being aware of any such evidence. In addition, the record before us does not contain any additional evidence supporting the hypothetical link between the CI and the capital murder. There is no evidence that the CI was present during the alleged attempted robbery or shooting, that he had ever had any interaction with any of the people

16

involved other than the one controlled buy from Espino, or that he was connected to the alleged capital murder in any way.

Lerma bore the burden of presenting evidence that there was a reasonable probability that the CI could give testimony necessary to a fair determination of his guilt or innocence. We conclude that the record is devoid of such evidence. Although the Defense and the trial court constructed a hypothetical situation in which Alejandro intentionally killed Espino, neither the Defense nor the State presented any evidence that the hypothetical situation was actually true—the officers merely affirmed that it was possible.[4] Thus, the allegedly exculpatory theory is "mere conjecture or supposition about possible relevancy" and does not support the trial court's order. *See Bodin*, 807 S.W.2d at 318.

Because the record before us contains no evidence indicating the materiality of the CI's identity, we conclude that the trial court abused its discretion in granting Lerma's motion to dismiss. *See* Tex. R. Evid. 508(c)(2)(A) (requiring court to find that "a reasonable probability exists that the informer can give testimony necessary to a fair determination of guilt or innocence" before dismissing case under Rule 508); *Sotelo*, 164 S.W.3d at 762–63 (reversing the trial court's order dismissing the cases against the defendant because "the evidence does not show that the informant

---

[4] Moreover, it appears from the record before us that the trial court merely assumed that evidence indicating that Alejandro killed Espino intentionally rather than accidentally would be exculpatory. Neither the trial court, nor the Defense, nor any witness ever explained how Alejandro's intent could affect the State's ability to prove the elements of capital murder as alleged in Lerma's indictment.

17

may have been able to give testimony necessary to a fair determination of the issues of guilt or innocence"). Accordingly, we sustain the State's sole appellate issue.[5]

**CONCLUSION**

We reverse the trial court's order granting Lerma's motion to dismiss and remand this cause to the trial court for further proceedings consistent with this opinion.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Reversed and Remanded

Filed:   October 25, 2018

Do Not Publish

---

[5] Lerma contends on appeal that the State waived any complaint it may have about the trial court's finding that a reasonable probability exists that the informer can give testimony necessary to a fair determination of guilt or innocence because the State failed to object to this finding. However, Lerma cites no authority indicating that the State was required to object to this specific finding apart from appealing the court's dismissal order. Moreover, even assuming, without deciding, that the State was required to object to this finding, we conclude that it did so with sufficient specificity to alert the trial court to its complaint. At the June 2017 hearing, the trial court found "that the confidential informant can give testimony necessary for guilt or innocence." The prosecutor stated, "Note our exception, please, Your Honor." The trial court responded, "Except all you want, Counselor. You know where the appellate court is."

18